Paolo (Paul) LaPORTA

v.

UNITED STATES of America.

Giovanni (John) LaPORTA

v.

UNITED STATES of America.

Alberto FICALORA

v.

UNITED STATES of America.

Civ. A. Nos. 84–6171, 84–6172
and 85–118.

United States District Court,
E.D. Pennsylvania.

Dec. 24, 1986.

Lawrence A. Dubin, Goldberger and Dubin, New York City, for Paolo LaPorta and Giovanni LaPorta.

Alan Ellis, Ellis, Fogelnest, and Newman, Philadelphia, Pa., for Alberto Ficalora.

Terri A. Marinari, Asst. U.S. Atty., Philadelphia, Pa., for the U.S.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

Three motions to vacate and/or set aside a sentence pursuant to 28 U.S.C.A. § 2255 (West 1982 & Supp.1986) have been filed by defendants Alberto Ficalora ("Ficalora"), Paolo LaPorta ("P. LaPorta") and Giovanni LaPorta ("G. LaPorta"). The motions are denied for the reasons now stated.

### Procedural Background

On May 7, 1984, these three defendants entered guilty pleas[1] pursuant to Fed.R. Crim.P. 11(e)(1)(B) to various counts of an indictment charging them with conspiracy to distribute heroin and cocaine, distribution of heroin and cocaine, and aiding and abetting, in violation of 21 U.S.C.A. § 846, 21 U.S.C.A. § 841(a)(1), and 18 U.S.C.A. § 2(a). Ficalora pled guilty to six of eleven counts; P. LaPorta pled guilty to five of nine counts; and G. LaPorta pled guilty to three of four counts.

On June 13, 1984, Ficalora was sentenced to the custody of the Attorney General for 15 years and fined $25,000 on each of six counts. Sentence of imprisonment on five of the counts was concurrent so that Ficalora's total sentence was imprisonment for

---

**1.** United States v. Ficalora, Criminal Action No. 84–41–1; United States v. Paolo LaPorta, Criminal Action No. 84–41–2; United States v. Giovanni LaPorta, Criminal Action No. 84–41–3.

30 years, a special parole term of 15 years and a fine of $150,000. P. LaPorta and G. LaPorta were both sentenced on June 22, 1984. P. LaPorta was sentenced to the custody of the Attorney General for 15 years on one count and five years followed by five-year special parole terms on each of the other four counts; he was also fined $25,000 on each of the five counts. P. LaPorta's total sentence was imprisonment for 35 years, a special parole term of 20 years and a fine of $125,000. G. LaPorta was sentenced to the custody of the Attorney General for 10 years on one count and five years followed by five-year special parole terms on the remaining two counts; he was also fined $25,000 on these counts. G. LaPorta's total sentence was imprisonment for 20 years, a special parole term of 10 years and a fine of $50,000.

On October 11, 1984, Ficalora filed a motion to correct a sentence imposed in an illegal manner and/or for a reduction of sentence pursuant to Fed.R.Crim.P. 35, on the ground that Ficalora was not afforded the opportunity to review his presentence report in violation of Fed.R.Crim.P. 32(c)(3)(A) and 32(a)(1)(A); Ficalora contended that the court at sentencing was misled by inaccuracies in the presentence report. Ficalora also contended that the Government failed to describe accurately his culpability and financial gain from the crimes despite "off-the-record assurances by the government." (Ficalora's motion dated October 15, 1984 at p. 3). The court denied this Rule 35 motion for the reasons stated in its Memorandum and Order dated September 12, 1985.

On October 15, 1984, the LaPortas filed a motion to reduce sentence pursuant to Fed. R.Crim.P. 35, on the ground that the defendants' behavior in prison and projected parole release dates justified a reduction in sentences. The LaPortas also asserted that there were off-the-record assurances by Government representatives that their low levels of culpability would be brought to the court's attention. The court denied the LaPortas' Rule 35 motion for the reasons stated in its Memorandum and Order dated July 3, 1985.

The LaPortas filed a motion to vacate and/or set aside a sentence pursuant to 28 U.S.C.A. § 2255 on December 17, 1984. Ficalora filed an original motion pursuant to 28 U.S.C.A. § 2255 on January 9, 1985, and then filed an amended motion on October 7, 1985. The three defendants now argue that their guilty pleas were neither voluntary nor intelligent waivers of their rights because all the defendants allegedly relied upon a promise made by Drug Enforcement Administration ("DEA") Special Agent Frank Panessa ("Panessa") to G. LaPorta that their sentences on various counts would run concurrently. The defendants allege that Panessa stated to G. LaPorta that the defendants' sentences would "run together" and that Panessa would tell the court that the defendants were "meatballs." Therefore, it is argued that the Government's failure to fulfill Panessa's alleged promises constituted a breach of a plea bargain agreement that rendered the pleas invalid. In his amended motion, Ficalora, an Italian citizen, also argues that his guilty plea was not intelligently made because his attorney failed to provide effective assistance of counsel in not informing him of the effect of his guilty plea under the immigration laws. The court held an evidentiary hearing on these § 2255 motions on February 4 and 5, 1986.

**Factual Background**

Panessa, acting in an undercover role (as a drug dealer) for over nine months, collected evidence to support the indictment of Ficalora, the LaPortas, and five other defendants. During this DEA investigation, Panessa spent a significant amount of time with G. LaPorta. (Tr. 2/5/86 at 170–72).

The trial of Ficalora and the LaPortas was scheduled to begin May 7, 1984. On May 4, 1984, Panessa was at the U.S. Attorney's Office in Philadelphia to prepare for trial. At G. LaPorta's request, his trial attorney, Joseph M. Fioravanti, Esquire, asked Panessa to come to the place where G. LaPorta was being held. When Panessa arrived, G. LaPorta asked Fioravanti to

leave so that he could speak with Panessa alone. (Tr. 2/5/86 at 96). Defendants' § 2255 motions are based on statements allegedly made by Panessa to G. LaPorta during that private conversation on May 4, 1984.

G. LaPorta claims that he wanted Panessa to help the defendants obtain shorter sentences and incarceration at the same facility. (Tr. 2/5/86 at 97). Panessa testified that he did not know why G. LaPorta wanted to talk to him when he was asked to see G. LaPorta. (Tr. 2/5/86 at 155). G. LaPorta testified that he told Panessa he respected and liked Panessa, despite his role in the defendants' apprehension. (Tr. 2/5/86 at 96–97). G. LaPorta stated that he told Panessa of his fear that Ficalora, his brother and he would receive long prison sentences because there were so many counts against them. (Tr. 2/5/86 at 96–98).[2] G. LaPorta testified that Panessa assured him that, "you don't have to worry about this, you know. These counts don't mean anything.... They run together." (Tr. 2/5/86 at 97). G. LaPorta also testified that he asked Panessa to do him a favor and let the judge know that he and his brother and Ficalora were insignificant participants in the criminal activity charged. (Tr. 2/5/86 at 103–104). G. LaPorta claims that Panessa said that he would advise the court that the three defendants were "meatballs"; G. LaPorta interpreted this term to mean insignificant individuals. (Tr. 2/5/86 at 103–104). In his § 2255 motion, G. LaPorta argues that when he pled guilty on May 7, 1984, he relied upon these alleged promises by Panessa that the court would be advised of his low level of culpability, and that sentences on the various counts would run concurrently.

Panessa's recollection of the May 4, 1984 conversation differed significantly. Panessa testified that G. LaPorta sought his advice on whether or not to plead guilty and that G. LaPorta kept insisting the defendants were "small fries." (Tr. 2/5/86 at 156–57). Panessa denied using the term "meatballs" or telling G. LaPorta that he would inform the court of the level of culpability of the defendants on his own initiative. (Tr. 2/5/86 at 159–60; 161). Panessa had stated in a prior affidavit that, "[d]efendant [Giovanni] LaPorta requested that I do him one favor. He asked me to tell the truth *if I were called upon to describe how big they* [G. LaPorta, P. LaPorta and Ficalora] *really were.* I agreed to do so." (Panessa Affidavit, 12/14/84) (emphasis added). Panessa denied that he told G. LaPorta that all his counts would "run together." (Tr. 2/5/86 at 158, 162).

P. LaPorta testified that G. LaPorta spoke to P. LaPorta and Ficalora together at the Detention Center after the meeting of Panessa and G. LaPorta on May 4, 1984, but before May 7, 1984. (Tr. 2/5/86 at 142). P. LaPorta stated that G. LaPorta told P. LaPorta and Ficalora that Panessa was going to help the three men and if they pled guilty, "all counts are going to run together.... We're not going to do so many years." (Tr. 2/5/86 at 143). P. LaPorta and Ficalora do not argue in their motions that Panessa ever made any statements directly to either or both of them concerning concurrent sentences or discussions of culpability with the court; P. LaPorta and Ficalora argue that they relied to their detriment upon the statements Panessa made to G. LaPorta and reported by G. LaPorta to them.

A second private meeting occurred between Panessa and G. LaPorta on May 7, 1984 prior to his guilty plea. When Panessa entered the courtroom on May 7, 1984, G. LaPorta's attorney told Panessa that G. LaPorta wanted to speak to him alone. (Tr. 2/5/86 at 162). When Panessa went to speak with him, G. LaPorta asked Panessa to stop Frank Affatigato from calling G. LaPorta's wife; G. LaPorta believed that Affatigato was an informer over whom Panessa had some control. (Tr. 2/5/86 at 100–102; 162–64). G. LaPorta testified that he mentioned Ficalora's immigration

---

**2.** Ficalora faced a possible sentence of 90 years; P. LaPorta faced a possible sentence of 75 years; G. LaPorta faced a possible sentence of 45 years' imprisonment.

status but that Panessa never made any assurances concerning Ficalora's deportation. (Tr. 2/5/86 at 106). Panessa denies speaking to G. LaPorta about Ficalora's immigration status on May 4 or May 7, 1984. (Tr. 2/5/86 at 165).

On May 7, 1984, Ficalora, P. LaPorta and G. LaPorta entered guilty pleas pursuant to Fed.R.Crim.P. 11(e)(1)(B). Before accepting the guilty pleas, the court asked each of the defendants whether his plea was voluntary or the result of force or threats or promises; each of the defendants responded under oath that his plea was voluntary and not the result of threats or promises. (Tr. 5/7/84 at 22; 36; 45–46).[3a,3b,3c]

Prior to Ficalora's sentencing on June 13, 1984, the judge asked about a January, 1984 deportation order against Ficalora to determine if Ficalora would serve his prison sentence before he was deported. (Tr. 6/13/84 at 11–13). Assistant U.S. Attorney Terri Marinari ("Marinari") said that five years after Ficalora's deportation, he could make application for waiver of excludability from the United States without seeking special permission from the Attorney General. *See* 8 U.S.C.A. § 1182(a)(9), (10), (17), (23) and 8 U.S.C.A. § 1182(h)

(West 1970 & Supp.1986). Ficalora's attorney at the sentencing, Robert Simone, Esquire ("Simone"), did not correct Marinari's statement of the immigration consequences of Ficalora's guilty plea and sentencing.

## Findings of Fact

Panessa told G. LaPorta on May 4, 1984 that Panessa would tell the truth about the defendants' level of culpability and involvement if Panessa were called upon to testify at the sentencing of any of the defendants. Panessa was not called upon to testify by either the Government or defense counsel at the sentencings of Ficalora, P. LaPorta or G. LaPorta.

Panessa did not state to G. LaPorta on May 4, 1984 or May 7, 1984 that G. LaPorta's sentences on his criminal counts would "run together" or run concurrently if G. LaPorta pled guilty.

Panessa did not state to G. LaPorta on May 4, 1984 or May 7, 1984 that P. LaPorta's or Ficalora's sentences would "run together" or run concurrently on the counts charged if P. LaPorta or Ficalora pled guilty.

Panessa did not state to G. LaPorta on May 4, 1984 or May 7, 1984 that Panessa would tell the court, either on or off the record, that the defendants were "meat-

**3a. FICALORA:**

THE COURT: Has anyone promised you what your sentence would be?
THE DEFENDANT: No.
THE COURT: Has anyone threatened you or told you something terrible will happen if you don't enter a plea of guilty?
THE DEFENDANT: No, sir. [sic]
THE COURT: You're doing this voluntarily knowing this.
THE DEFENDANT: Yes, Your Honor.
THE COURT: Do you understand and do you agree the Government's statement of the plea agreement was what it was?
THE DEFENDANT: Yes, Your Honor.
THE COURT: In that circumstance I'm prepared to find that you're doing this knowingly and voluntarily. I'll accept the plea if there's a factual bases [sic] for it.
(Tr. 5/7/84 at 22).

**3b. P. LaPORTA:**

THE COURT: Mr. LaPorta, did you understand that plea agreement?
THE DEFENDANT: Yes.

THE COURT: Did anyone force you to enter into that plea agreement?
THE DEFENDANT: No.
THE COURT: Did anyone tell you something terrible would happen to you?
THE DEFENDANT: No.
THE COURT: Did anyone promise you what your sentence would be?
THE DEFENDANT: No.
(Tr. 5/7/84 at 36).

**3c. G. LaPORTA:**

THE COURT: Now, knowing all that, has anyone forced you to make this change of plea?
THE DEFENDANT: No. This is was [sic] our own decision.
THE COURT: No promises or threats or anything like that?
THE DEFENDANT: No such a thing.
THE COURT: Well, in that case I'm convinced the plea is voluntary. There's not any force or threats or inducement other than a valid plea agreement.
(Tr. 5/7/84 at 45–46).

balls," "small fry," or any other term which might be interpreted to mean an insignificant individual in terms of culpability or involvement in the criminal conduct charged.

Robert Simone, Esquire, limited his representation of Ficalora to defense of the February 2, 1984 indictment accusing Ficalora of eleven counts in violation of 21 U.S.C.A. § 846, 21 U.S.C.A. § 841(a)(1), and 18 U.S.C.A. § 2(a). Simone did not represent Ficalora on immigration law matters. Joseph P. Marro, Esquire ("Marro"), represented Ficalora on immigration law matters at the time of Ficalora's guilty plea and sentencing. Simone knew that Ficalora had a different attorney to represent him on immigration law matters.

Simone did not give erroneous immigration law advice to Ficalora in response to a direct question from Ficalora concerning whether he would be deported if he pled guilty to the six counts. Simone may have given Ficalora erroneous advice concerning exclusion from re-entry to the United States. Ficalora did not tell Simone that he would not plead guilty if his plea would cause him to be excluded from re-entry into the United States.

Simone failed to correct any confusion or misstatement of immigration law made by Marinari at Ficalora's sentencing.

Simone had some conversation and correspondence with Marro before Ficalora's sentencing on June 13, 1984. Simone knew of the January, 1984 deportation order concerning Ficalora when Ficalora was sentenced.

Simone received a letter from Marro dated June 18, 1984, five days after Ficalora's

sentencing, outlining the effects of Ficalora's sentencing on his deportation and exclusion under the immigration laws.

### Discussion

■ A review of the testimony has convinced the court that G. LaPorta's allegations regarding Panessa's alleged representations lack credibility. With a possible maximum sentence of 45 years' imprisonment, G. LaPorta would have mentioned Panessa's alleged statements to the court, his attorney, or someone other than his co-defendants P. LaPorta and Ficalora, prior to sentencing, at the time of sentencing to a term of 20 years' imprisonment, or immediately thereafter. But the first time G. LaPorta alleged a breach of off-the-record assurances by a government employee was in a Fed.R.Crim.P. 35 motion filed four months after his sentencing after new counsel had been engaged to represent him. Before accepting G. LaPorta's guilty plea, the court specifically asked if anyone made any promises to him other than the plea agreement and he said, "No such a thing." (Tr. 5/7/84 at 45–46; see n. 3 supra). G. LaPorta claimed at the § 2255 hearing that he had lied under oath when asked if anyone had promised him anything to induce his guilty plea; this does not lend credibility to his § 2255 motion allegations or his sworn testimony at the § 2255 hearing. (Tr. 2/5/86 at 104, 119).[4]

G. LaPorta spoke at great length at his sentencing about the government's role in portraying the scope of his criminal activities and his alleged low level of involvement in crime. (Tr. 6/22/86 at 26–29). Yet not once during this statement to the court, or at any other time at his sentencing, did

---

**4.** G. LaPorta stated on direct examination: "... I know the Judge, Mrs. Shapiro had told me at the sentencing, if anyone had talked to me prior to the sentence. And I guess I will have to say that I lied, ...." (Tr. 2/5/86 at 104).

On cross-examination, G. LaPorta again admitted that he had lied:

Q. When you came to court on that day, when you came to court for your sentencing, did you ever tell Judge Shapiro that you had a problem with your attorney or you didn't trust your attorney?
A. No, I did not.

Q. Do you recall, Mr. LaPorta, the questions that the Judge asked you on the date that you changed your plea?
A. I don't recall the line of questioning, but I remember she asked me a lot of things. Whatever she said,—I think she mentioned if anyone had made any promises to me. I said, no.
Q. And you're telling us today that that's not true, that that was a lie?
A. Yes.
(Tr. 2/5/86 at 119).

G. LaPorta mention Panessa's alleged representations or promise to tell the court that he was not as involved as the government had portrayed him. None of the defendants called Panessa to testify at his sentencing or inquired as to Panessa's availability to testify on June 13, or June 22, 1984.

G. LaPorta claims that he did not tell his attorney at that time about Panessa's alleged assurance that his sentences would "run together," because he had lost faith in his attorney and trusted Panessa, the government agent who deceived him for over nine months, more than his attorney. (Tr. 2/5/86 at 118–121). No matter how little trust G. LaPorta put in his attorney, the court cannot believe that if Panessa had made the assurances to G. LaPorta that he relied on, he would not have mentioned this when informing Fioravanti that he intended to change his plea to guilty. But the most persuasive evidence that Panessa never made the alleged statements is the chronology of the sentencings of the three defendants. Ficalora was sentenced on June 13, 1984, nine days before G. LaPorta. P. LaPorta was sentenced the morning of June 22, 1984, *before* G. LaPorta. G. LaPorta knew that both Ficalora and P. LaPorta received long prison sentences and that both defendants received consecutive, not concurrent, sentences. Nevertheless, G. LaPorta failed to mention at his subsequent sentencing Panessa's "promise" of concurrent sentences in exchange for guilty pleas. G. LaPorta explained at the § 2255 hearing that he did not say anything to the court or Fioravanti about Panessa's "promise" because, "[w]e felt we were cheated and I had forgotten all about it. I accepted things the way they were following." (Tr. 2/5/86 at 121). It is not credible that a man who was sentenced to 20 years' imprisonment after he pled guilty in reliance on a government promise of a sentence of 5 or 10 years, would simply "accept[] things the way they were following." (Tr. 2/5/86 at 121).

■ Even if this court found that Panessa had stated to G. LaPorta that the defendants' counts "would all run together" and that he would communicate to the court that the defendants were "meatballs," these statements would be too vague to consider as promises upon which G. LaPorta could reasonably have relied.

■ Even if DEA Agent Panessa made the statements alleged, and even if those statements were specific enough to consider as promises upon which G. LaPorta could reasonably have relied, there is no evidence that Panessa had any authorization from the government to make these promises or any other promises to G. LaPorta or the other defendants. Unless plea bargain promises to a criminal defendant are specifically authorized, the government is not bound by those promises, except in unusual circumstances. *See generally United States v. Hudson*, 609 F.3d 1326, 1328–29 (9th Cir.1979) (prosecution not bound where Secret Service agent alleged to have made unauthorized promise to defendant and the defendant incurred no detriment in reliance on promise); *United States v. Lombardozzi*, 467 F.2d 160, 162 (2d Cir.1972), *cert. denied*, 409 U.S. 1108, 93 S.Ct. 907, 34 L.Ed.2d 688 (1973) (where FBI agent convinced defendant that agent spoke for the prosecution, prosecution not bound where assurances of concurrent federal and state sentences did not amount to promise and where defendant knew agent could not bind prosecution).

■ *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971), requires a prosecutor to fulfill any promise or agreement made by the prosecutor that induced or became part of the consideration of the guilty plea. But a DEA Agent is not part of the "prosecution team," as the defendants argue, and any statement made by Panessa constituting a "promise" would not bind the prosecutor under *Santobello*. In an analogous situation, plea bargain negotiations with law enforcement personnel other than a United States government attorney are not subject to the *per se* evidentiary proscriptions of Fed.R.Crim.P. 11(e)(6) or Fed.R.Evid. 410, unless the person acts with express author-

ity from a government attorney. *See, e.g., United States v. Sebetich,* 776 F.2d 412, 421 (3d Cir.1985); *United States v. Grant,* 622 F.2d 308, 312–313 (8th Cir.1980).

■ Even if Panessa made the alleged statements to G. LaPorta, P. LaPorta and Ficalora could not have reasonably relied on Panessa's statements. Assuming that the alleged statements would constitute a promise made to G. LaPorta, it is uncertain whether the alleged statements were intended to extend to P. LaPorta or Ficalora. G. LaPorta stated at the § 2255 hearing that "I felt as if Panessa was going to help just the two of us, me and my brother," (Tr. 2/5/86 at 105) when G. LaPorta discussed why he did not mention Panessa's alleged promises after he learned of Ficalora's sentencing. In addition, if the government is not bound by unauthorized promises made directly by an agent to one criminal defendant, the government is also not bound by unauthorized promises communicated to criminal defendants indirectly through a third party who is not part of the prosecutor's office. Finally, the government is not bound by misrepresentations or misinterpretations of Panessa's statements by G. LaPorta to P. LaPorta and Ficalora.

Because the defendants failed to prove that Panessa made the alleged statements to G. LaPorta, or that they relied on these statements to their detriment, the defendants failed to prove that their guilty pleas were unknowing, unintelligent, or involuntary waivers of rights, or were invalid as induced by an unfulfilled plea bargain promised by the prosecutor. The § 2255 motions must be denied.

■ Ficalora also alleges that his sentence should be vacated or set aside because ineffective assistance of counsel rendered his plea unintelligent. Ficalora alleges that erroneous advice on deportation consequences and failure to inform on exclusion from re-entry consequences of entering a guilty plea constituted ineffective assistance of counsel. Because Ficalora does not carry his burden of proof under *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct.

366, 88 L.Ed.2d 203 (1985), his § 2255 motion on this ground must be denied.

In *Hill,* the Supreme Court adopted the two-part standard set forth in *Strickland v. Washington,* 466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to evaluate ineffective assistance of counsel claims arising out of the entry of a guilty plea. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Hill,* 474 U.S. at ——, 106 S.Ct. at 369, 88 L.Ed.2d at 209. Second, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill,* 474 U.S. at ——, 106 S.Ct. at 370, 88 L.Ed.2d at 210.

Simone represented Ficalora through the entry of his guilty plea and sentencing. (Tr. 2/4/86 at 19). Although Simone was not an expert in immigration law, he did know "a little but very little" about immigration law. (Tr. at 2/4/86 at 22). Simone and Ficalora agree that they discussed deportation before Ficalora entered his plea of guilty. The two men differ on the substance of any discussions. Simone testified that he "never told him [Ficalora] that if he pled guilty in this case that that order [the January, 1984 deportation order] would be vacated and he wouldn't be deported.... I believe that I told him that it would be nice if you could be deported rather than go to jail because you are going to get some time, but the deportation if it remains in effect will not come about until after whatever sentence you have to serve is served." (Tr. 2/4/86 at 23). Simone testified that he did not recall any conversation in which Ficalora told Simone that he would not plead guilty if he were going to be deported as a result of his plea. (Tr. 2/4/86 at 23).

Ficalora testified that he asked Simone whether he would be deported if he pled guilty and that Simone did not think Ficalora would be deported because of Ficalora's wife and four children in the United States, but that Simone told him "even if they deport you, in a year or two, before five,

you are able [sic] to come back in the United States." (Tr. 2/5/86 at 14, 27).

Regardless of whether Simone gave Ficalora erroneous immigration advice or failed to give immigration advice concerning the likelihood of deportation or the likelihood of exclusion from re-entry upon entering a guilty plea, Simone's representation did not fall below an objective standard of reasonableness. The courts are split whether a mere failure to inform an accused of the immigration consequences of a guilty plea, without more, constitutes unconstitutional ineffective assistance of counsel. *Compare, e.g., United States v. Santelises*, 509 F.2d 703 (2d Cir.1975) *(per curiam)* (no ineffective assistance for failure to inform) *with Commonwealth v. Wellington*, 305 Pa.Super. 24, 451 A.2d 223 (1982) (ineffective assistance found).[5] The federal cases suggest an affirmative misrepresentation might be different; but no circuit court has yet held that an affirmative misrepresentation by counsel that the accused would not be deported or excluded upon entering a guilty plea, without more, constituted ineffective assistance of counsel. *See Downs-Morgan v. United States*, 765 F.2d 1534, 1540 (11th Cir.1985) ("We decline to hold that an affirmative misrepresentation by an attorney in response to a specific inquiry by the accused which results in a plea of guilty necessarily constitutes ineffective assistance of counsel."); *cf. United States v. Santelises*, 509 F.2d 703, 704 (2d Cir. 1975) *(per curiam)* (petitioner fails to state a claim for ineffective assistance of counsel where petitioner failed to allege that attorney made an affirmative misrepresentation of immigration law); *United States v. Briscoe*, 432 F.2d 1351, 1353 (D.C.Cir.1970) (fact that defendant was misled by govern-

ment attorney as to consequence of deportability may render guilty plea subject to attack).

The Supreme Court is clear that this court must evaluate Simone's representation as a whole, and not focus on any single misrepresentation: "In any case presenting an ineffective assistance claim, the performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances." Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065 (emphasis added). Upon consideration of all the circumstances, Ficalora has not shown Simone's representation fell below an objective standard of reasonableness.

Simone properly explained to Ficalora the conditions of the plea agreement, the nature of the charges, the defenses that could have been raised at trial, and the maximum possible jail term and fine. *(See* Tr. 5/7/84 at 11–24). Ficalora had been involved in immigration law proceedings for ten years so that he knew certain attorneys practice immigration law and other attorneys practice in other areas of law. Ficalora was represented in his immigration proceedings by Marro, who continued to represent Ficalora in his then-pending decision on whether or not to appeal the January, 1984 deportation order. Simone knew that Marro represented Ficalora on immigration matters and had correspondence or conversation with Marro prior to Ficalora's sentencing. (Tr. 2/4/86 at 21–22). Simone testified that he thought that Ficalora was conferring with his immigration attorney on any questions he might have had concerning his deportation status. (Tr. 2/4/86 at 25). Although Ficalora was in continuous custody from January 26,

---

5.  Ficalora does not argue that any alleged failure by the court to inform the defendant of the immigration consequences of his guilty plea would render the plea deficient. At Ficalora's sentencing, this court, *sua sponte*, raised the issue of the immigration consequences of Ficalora's plea. (Tr. 6/13/84 at 11–13). Federal Rule of Criminal Procedure 11 does not require the trial judge to apprise the defendant of the possible immigration consequences of his guilty plea. *Downs-Morgan v. United States*, 765 F.2d 1534, 1538 (11th Cir.1985); *United States v. Rus-

sell*, 686 F.2d 35, 39 (D.C.Cir.1982); *Garcia-Trigo v. United States*, 671 F.2d 147, 150 (5th Cir. 1982); *Fruchtman v. Kenton*, 531 F.2d 946, 949 (9th Cir.1976); *Michel v. United States*, 507 F.2d 461, 464–465 (2d Cir.1974). Nor does a trial judge's failure to inform the defendant of the immigration consequences of a guilty plea alone render the plea constitutionally deficient. *See Downs-Morgan*, 765 F.2d at 1539 n. 12; *United States v. Holton*, 228 F.2d 827, 830 (7th Cir.), cert. denied, 351 U.S. 963, 76 S.Ct. 1027, 100 L.Ed. 1484 (1956).

1984 until his sentencing, he had ample opportunity to communicate with Marro. It was not unreasonable in the circumstances if the criminal defense attorney, knowing his client had another attorney handling immigration law questions, expected the immigration law attorney to advise the client on the effect of a guilty plea on the client's deportation order and possible exclusion after deportation, where the criminal defense attorney also knew that the immigration lawyer was aware of the pending criminal proceeding.

■ Ficalora also has not met his burden of proof on the "prejudice" inquiry under *Hill*. The issue is whether there is a reasonable probability that, but for Simone's alleged errors, Ficalora would not have pled guilty and would have insisted on going to trial. Ficalora argues that in deciding to plead guilty, he relied upon Simone's alleged misrepresentation of the likelihood of deportation and the probability of exclusion under immigration law and Simone's failure to correct Marinari's misstatement of the procedure applying to a waiver of exclusion.

Even if the court found Ficalora's testimony more credible than Simone's, and found that Simone misstated the likelihood that Ficalora would be deported or could return to the United States five years after deportation after a plea of guilty, Ficalora's reliance on these statements of immigration law would not have been reasonable. If the immigration consequences of his plea were vital to his decision, Ficalora would have asked Marro for advice. Ficalora knew that he was subject to a prior deportation order, regardless of whether he pled guilty, was convicted at a trial, or was found not guilty by a jury. Ficalora chose not to appeal the prior deportation order until he was sentenced on the criminal charges. Simone told Ficalora that the prior deportation order would not be vacated if Ficalora pled guilty. (Tr. 2/4/86 at 22–23). Therefore, regardless of what Simone might have told Ficalora about the likelihood of deportation resulting from his guilty plea to the crimes charged, Ficalora knew that he was already subject to the January, 1984 deportation order. The only uncertainty there could be was the possibility of his re-entry.

At the sentencing, Marinari misstated that aspect of immigration law only in response to a query by the court. Marinari told the court that five years after his deportation, Ficalora could apply to re-enter the United States without permission of the Attorney General. (Tr. 6/13/86 at 46). Under 8 U.S.C. § 1182(h), Ficalora would need the permission of the Attorney General to apply to re-enter the United States.

■ Marinari's misstatement does not support Ficalora's allegation that Simone's representation constituted ineffective assistance of counsel. Marinari's statements were made at his *sentencing* not at his change of plea. Reliance by Ficalora on Marinari's error cannot be considered when determining if Ficalora relied upon *Simone's* alleged errors to his prejudice. An argument that Ficalora relied on Simone's failure to correct Marinari at the sentencing also fails to satisfy the prejudice inquiry under *Hill* because Simone's silence at the sentencing could not have affected Ficalora's change of plea almost five weeks earlier.

Ficalora pled guilty not in reliance upon any misstatement made by Simone, but because the government's evidence against him was overwhelming. Ficalora's presentence report detailed his integral role in a large, international drug ring conspiracy. The government had evidence, including testimony by undercover agents and court authorized electronic surveillance tapes, proving Ficalora's membership in a conspiracy that provided to DEA agents on at least five occasions drugs totaling 2.74 kilograms of 100% pure heroin and .07 kilograms of 100% pure cocaine worth over six million dollars if sold. Ficalora did not dispute the accuracy of this evidence against him. (Ficalora Presentence Investigation Report, 6/5/84). Ficalora knew that two other key members of the conspiracy, P. LaPorta and G. LaPorta, also planned to plead guilty.

One of the defendants named in the original indictment, Filippo Mauro, did go to trial and was found not guilty by the jury. Unlike Ficalora, Mauro allegedly played a minor role in the co-defendants' conspiracy. That one defendant was found not guilty does not mean that Ficalora would have insisted on trial but for his attorney's errors. Mauro's acquittal is not Simone's error.

Because Ficalora cannot carry his burden of proof on either of the two required standards under *Hill v. Lockhart*, his § 2255 motion is denied.

All findings of fact and conclusions of law in this Discussion are deemed incorporated in those sections.

### Conclusions of Law

Ficalora, P. LaPorta, and G. LaPorta made knowing, voluntary, and intelligent waivers of their rights when they entered guilty pleas.

The government did not breach plea bargain agreements with Ficalora, P. LaPorta, and G. LaPorta. Their guilty pleas were not induced in reliance on authorized or binding promises made as part of the plea bargaining.

The alleged statements made by Panessa to G. LaPorta were too vague to characterize as authorized or binding promises upon which the defendants could rely.

An unauthorized promise made by a DEA agent to a third person, other than a government prosecutor, and communicated by the third person to a criminal defendant, cannot bind the government as does an authorized promise by a prosecutor made as inducement for a plea bargain agreement.

The defendants failed to prove that Panessa had express authority to make binding promises to G. LaPorta.

Ficalora fails to carry his burden of proof under *Hill v. Lockhart* that counsel's representation fell below an objective standard of reasonableness.

Ficalora fails to carry his burden of proof under *Hill v. Lockhart* that there was a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.